May it please the Court, my name is Michael Rubin, and I represent Endo Steel, the appellant in this matter. I might just note for the record that Endo Steel does not have an E. And that does have some significance in this case, believe it or not. I'm sorry, it doesn't have a what? An E at the end. Endo Steel was a steel subcontractor on a public works construction project in the state of Arizona. And that is central to what we believe is an erroneous decision by the Bankruptcy Appellate Panel in this case. The opinion of the Bankruptcy Appellate Panel should be reversed for several reasons. First of all, it misapplies holdings of this Court and Arizona law. It's inconsistent with the policies and purposes of the Little-Miller Act, which is Arizona's version of the Federal Miller Act, which is intended to protect those who provide labor and materials to public works projects. Third, the Bankruptcy Appellate Court decision ignores fundamental principles of Arizona contract law that are, in fact, universally accepted throughout the country. And finally, it is bad public policy. In 1989, this Court decided the Fiegert case. Fiegert case established the standard that has been adopted by other circuits and district courts throughout this country regarding whether a payment to a subcontractor on a bonded public works project is subject to being set aside as a preference. And what this Court said in Fiegert was that provided that there are unpaid contract proceeds that the surety can go after that are in excess of what is being paid to the subcontractor, then there is no preference. Counsel, that would be persuasive, but for the fact that the check bounced. Doesn't that complicate the issue in this case? It is the only difference between this and Fiegert, Your Honor. But it does not change the fundamental policy of Fiegert, which is, number one, to recognize the policies and purposes of the Little-Miller Act, which is to protect people in my client's position. And number two, the fundamental question is whether the debtor was prejudiced by the payment to Ando Steele. Yes, but we still have the word contemporaneous. Even if we rock along with you on your new value argument, we get to what the BAP was concerned about, about the requirement of contemporaneous. Well, Your Honor, the ---- I don't want to misrepresent your argument. No, Your Honor, that's a very fair question, and it's the crux of this case. The fundamental assumption of the Bankruptcy Appellate Panel, which we submit is erroneous, is that Ando Steele could not have asserted a bond claim at the time it received the payment that is wrong, Your Honor, for a number of reasons. First of all ---- Yes, because it had already given it up under the Arizona statute. Well, Your Honor, we submit that that's an incorrect interpretation of the statute. We think that's the fundamental ---- BAP said it had already given up the claim when it got the bad check. That's correct. Correct. Okay. Now, we believe that that threw out years of established Ninth Circuit law and Arizona law. The Arizona statute, which is ARS 33-1008, was intended to standardize the forms that are used for the releases on both public and private construction projects. The Bankruptcy Appellate Panel decision essentially concludes that that statute represented a major substantive change in Arizona law regarding the effectiveness of a lien release. It didn't. With all due respect, all that said ---- What's the purpose, then, of having two different forms, one an unconditional release and one a conditional release? What would be the purpose of having those two different forms if there weren't an intent to have two different effects? Your Honor, in hindsight, we submit that my client would have been much better off if it had signed a conditional release. However, what the legislature clearly intended is to allow parties to rely on unconditional lien releases. If there had been reliance in this case, this case would look a lot different. The trustee has ---- Your Honor, in the language of the statute, and I certainly encourage the Court to review the statute carefully, it speaks in what is required by the contractor to use as a form of lien release. It specifies the form, and it says it's only effective if you follow this form. We submit that the Bankruptcy Appellate Panel actually turned that statute on its head and is saying that if you use that form, you ignore whether there's consideration, which has been required by law for many, many years before the enactment of that statute, and you ignore whether in absence of consideration there is a basis for estoppel, such as reliance. We submit that the underlying obligation is gone. It just means that there is not a lien available to enforce it. So ---- Your Honor, if that were a correct interpretation of Arizona statute, then that would be totally inconsistent with the purposes and policies of the Little-Miller Act, which is supposed to protect parties in my client's position. In fact, as I indicated earlier, I think that's bad public policy, because as happened in this case, the contractor dangles a check in front of a subcontractor and says, you sign this release, and I'll give you this check. And the contractor says, I'll sign the conditional release, and once the check clears, then I'll sign the unconditional release. And in hindsight, I submit that that would have been a better course of action. And all your comments about hindsight lead me to think that, well, the unconditional release is really an unconditional release. In other words, why would you even have a conditional release if the intent of the unconditional release is not to be unconditional? Well, Your Honor, if my client had not received a check, a payment, then clearly a conditional release would have been the appropriate method. But if the Court looks at the release, which is at tab 1 of the record at page 28, it says Endo Steel received a payment of $194,000. On the date that was received and the lien release was executed, that was absolutely correct. The question, according to United Metro, which is the only Arizona case that even interprets the statute, is that the Court should look at the intent of the parties. And a waiver must be clear and explicit. Now, if we accept your interpretation, then the purpose of the lien release would be thwarted, because then you'd have to go beyond the face of the lien and determine all of these issues that you're talking about, consideration, reliance, and whether or not payment was actually made, the extent of the payment, wouldn't we? Well, Your Honor, those are the substantive rules that are in place in Arizona. So the answer is partially yes. But the consideration was stated on the face of the release. If someone had relied on that release to their detriment under long-established law in this circuit, then the Arizona statute's effect would clearly have precluded the bond claim. That's a pretty convoluted scheme, it seems to me. Well, with all due respect, Your Honor, we don't believe that there's any evidence in this record that the Arizona legislature intended to overrule years of established fundamental contract law. Yeah, I remember. You represent a lot of subcontractors? I do, Your Honor. Yeah, I used to also. And I remember we'd always give these releases because they didn't mean a thing if we weren't paid. That's entirely correct, Your Honor. And we submit that the only change that the legislature made was to prescribe specific forms for that practice. Yeah. And that see, it goes a little deeper because we would give these releases all the time and wouldn't care because if the check bounced, we still had our lien. We knew that. Except I guess, as you point out, if there had been some reliance on our representation somewhere along the line, there'd been some detriment, we indeed could have lost the lien and probably would have. I never got one of those cases. I think that is correct. But then you have the Arizona legislature saying, hey, let's put some meaning into these lien releases. And it's either going to be conditional or it's going to be unconditional. And so when the sub gives this, it's going to mean something. And that seems to be a reasonably logical way, given the history of, you know, the practice, as to why the legislature would do this. Well, Your Honor, we submit that you're taking it a step too far. And that the legislature wanted to make the lien releases uniform and dictate what forms would be used, but they didn't intend to change fundamental principles of contract law, fundamental principles under the UCC, and to strip the protection of the Little-Miller Act from innocent subcontractors who, in hindsight, might have been wise to see a lawyer before they signed the document. But if you look at the face of the document in this case, Your Honor, you will see that Endo Steele correctly signed a document that said they were paid, they received a check, and that in terms of the intent that the United Metro case talks about, we only have evidence of intent from two parties. We have the presentation of a check, which is, I want you to release this lien in exchange for this $194,000. And we have the lien release that says, I'm releasing this lien because I'm being paid $194,000. We also submit, Your Honor, that since this case began, I have challenged opposing counsel to cite one case from anywhere in the United States where a lien release was enforced and a bond claim precluded, and a surety given the windfall of no liability on a bond, absent consideration or detrimental reliance. There is no such case. To conclude that the Arizona legislature, in a statute that merely addresses the form of lien releases, to make such a fundamental change in contract law, in contracting law, and the law of the negotiable instruments under the UCC, is erroneous and must be reversed. Mr. Rubin, you've got about seven minutes left. I hope at some point you're going to say something about your collateral estoppel argument. Well, Your Honor, yes, I would like to address that very briefly. Does that just go to new value? I'm sorry? That goes to the issue of new value? Yes, Your Honor. Okay. The only other issue that I believe is before the Court is whether the new value is measured at the time my client received the $194,000, as opposed to the time my client received the $194,000. On May 2nd, 1994. It's undisputed that that's the day payment was made. The second time, you mean? Correct. Go ahead. And we submit, Your Honor, before I move to that point, that if that check had not been remitted, the second check, Endo Steel would have had a claim on a bond, and there's no case law to the contrary. But if we look at the date of that payment, the question under a long line of cases, including Fiegert, is whether, if you take a snapshot, whether there were sufficient contract proceeds to protect the surety, so that the surety could exercise its equitable lien that the Supreme Court recognized in Perelman. The trustee is taking a position that has never been sustained in law, and is not even consistent with the purposes of 547B, which is that, no, no, we look at how the project ends up years later, and if the surety loses money, then every disbursement within the year, that is not the law. And in the Reuter case, in which the trustee made that same argument, this Court, in which Judge Rawlinson participated, held that that was incorrect, that the test is whether, at the time of the transfer, there were sufficient contract proceeds. And that's logical, because we are measuring the effect of the debtor of the transfer, the effect on the debtor of the transfer. What the trustee is proposing has nothing to do with that. I would like to reserve the balance of my time for rebuttal, unless the Court has any other questions. And your collateral is not, Liz, the trustee argued the same issue in another case in laws? Absolutely. Okay. Thank you. Thank you. Good morning. Thomas Axelson on behalf of Joseph J. Janus, the bankruptcy trustee. I'd like to start out by conceding something. I'd like to concede that ENDO should be paid. It did the work. For all we know, it did the work properly. It received a check. The check bounced. There's no disagreement that ENDO should be paid. But should ENDO be paid more than every other unsecured creditor of this estate? The trustee submits the answer is no. Well, you have to see, it had a lien, and it got diddled out of the lien by this contractor, giving him a bad check. And that makes him a little different. Well, I'm not – technically and legally, ENDO did not have a lien. Because this was a public works construction project, it had no lien rights. All it had was rights against a surety bond. Yes. It could have asserted a – Substitute for the lien. I mean, it still puts him in the position equivalent to secured creditors. Sure. Same thing. Absolutely. And – Why was a lien waiver executed if there was no lien? Well, it's – it may at some points in that document refer to lien waiver. But it also contains language regarding waiver of bond rights. And it specifically says – well, first let me refer to the statute upon which – that sets out the form that says this waiver and release is effective to release the surety on a payment bond. Then in the document, it states that this waiver is effective to release any state or federal statutory bond right and any private bond right. So although the document is sometimes perhaps carelessly referred to as a lien waiver, it is a total unconditional waiver. Yes. That's why it doesn't say lien waiver, does it? It says unconditional waiver. It is an unconditional waiver of all bond rights. And the question arises, why did not ENDO proceed against the bond? It knew that this debtor was having financial difficulty. There are numerous documents in the record where ENDO was threatening the debtor to get payment. Yet there's nothing in the record to indicate why ENDO never proceeded against the bond. Had ENDO proceeded against the bond, it would have been totally insulated from preference claims because there would be no diminution of the estate. The payment would have come from the bond. The contractor said he was going to pay him, and he paid him. That's why they didn't go against the bond. Isn't that right? From that, at that point in time, when a check was received, the contractor probably thought that he was getting paid pursuant to the check. And you're saying, well, okay, go ahead. It's, you know, it just seems so terribly inequitable that this would happen, and it seems that you've really got to rely on this Arizona statute and the unconditional release form that your client signed. I'm not sure it's entirely inequitable because this subcontractor, ENDO, was not left without a remedy. It received a dishonored check, and it has a whole plethora of claims it can now pursue arising from a dishonored check. What, against the bankrupt debtor? Not only that, but under Arizona statute, against the persons who actually signed the check, the signatories, there are common law warranty claims, there are criminal statutes, both misdemeanor and felony, that impose personal liability on the individuals at JWJ who signed the check. Why doesn't that Figert case apply here? This case is different from Figert in several respects. First, Figert did not involve a dishonored check. The law is clear that a replacement check issued on account of a dishonored check cannot constitute a contemporaneous exchange for new value. There have been numerous decisions within the Ninth Circuit. We cited the N. Ray Lee decision, which was a bankruptcy appellate panel. It cites numerous cases from other jurisdictions. In fact, I have not been able to find one case from any circuit that has cited a dishonored check as a contemporaneous exchange for new value. That would be new law. Well, doesn't the Reuter case address that, at least partially? Reuter did not address the dishonored check and a replacement check. Also … But just the new value. Is that right? That's correct. And there was also another reason that both Figert and the Reuter decision are different from this case, which is what this Court has already touched upon, the unconditional waiver. There never was an unconditional waiver signed in either the Figert decision or this case. Counsel, what's your response to opposing counsel's argument that the waiver of lien provision of the Arizona statute incorporated all of the jurisprudence that had gone before in terms of consideration and reliance? My response would be that he's absolutely correct, and that's why the statute has the conditional release form and the conditional language in that form. If a contractor is a contractor, clearly that act was designed to protect the laborers and the material men, just as my opposing counsel has indicated, and that's why that form is there. And in the published opinion by the Bankruptcy Appellate Panel, it explained that in most cases that's what a subcontractor should sign, is the conditional form. I think that's the  case. Endo asks in its briefs, you know, what could Endo have done to be more clear to indicate that it was only signing the waiver as a condition of receiving payment? Well, it could have chosen the conditional form, for one. Secondly, Endo could have modified the expressed terms of the waiver, and, in fact, that's what was done in the United Metro Materials v. Pena Blanca case, which is the Arizona Court of Appeals decision that interprets this statute. And in that case, they recognized that the contractor had made some changes to the unconditional form and said, well, it's no longer unconditional. Did you cite that in your red brief? It is, Your Honor. Okay. Also, the Arizona Supreme Court, in the AmFact Distributing Company v. J.B.'s Contractors case, says that it's incumbent upon the subcontractor that if this form it's signing does not accurately reflect its intent, it should modify the form. So I think both the statute and the Arizona case law that construes this area of the law are all consistent. Don't sign that unconditional form unless you mean it. And that unconditional form has not just this language in fine print down at the bottom of the page. This is big, bold all-capitalized language that is required to be there. And it specifically says, notice, this document waives rights unconditionally and states that you have been paid for giving up those rights. This document is enforceable against you if you sign it, even if you have not been paid. If you have not been paid, use a conditional release form. It's hard to imagine something that could be more clear. There are several other distinctions between this case and Figert, which I believe is the question that one of you had asked me. And I believe Judge Raulston brought up the collateral estoppel issue. I'd be happy to address either one of those. I didn't bring it up, but we like to hear it. Okay. Then I'll address that one. Collateral estoppel, I think, is a doctrine that is non-mutual collateral estoppel because one of the parties here was not a party to the prior proceeding. But you're talking about issue preclusion and the terms that we use. Issue preclusion. The issue that is present in this case that simply was not present in the earlier decision, which is Reuter, was the intent of the parties to this particular transaction. The statute that we're all here talking about is the Contemporaneous Transaction, which specifically requires us to look at the intent of these two parties concerning this specific transaction. Well, this transaction was not at issue in the Reuter case. The intent of these two parties was not at issue in the Reuter case. In fact, this transaction was not at issue in the Reuter case. Secondly, the statutory unconditional waiver form was not at issue in the earlier case. Also, this is a different construction project that we're talking about here. ENDO received a payment on the Phoenix Sky Harbor Taxiway T runway project. It's an entirely different project than the projects that were at issue in the Reuter decision. The counsel, when you strip away all of the excess, wasn't the issue the Contemporaneous Exchange for new value? Wasn't it the same issue and the same argument made on behalf of the trustee? I would submit that it isn't, Your Honor, because of several of these factors I'm bringing up. And I would also point out that the factors didn't, don't affect the issue of, the legal issue of what is a Contemporaneous Exchange for new value, do they? Well, I think they do affect it. And if you're talking about, if we extract just The issue was whether or not the security was diminished, whether or not the estate was diminished by the payment, by the preferential payments, the allegedly preferential payment. Whether it was diminished in that particular case on that construction project at that point in time. And those are all impacted by how much remaining contract proceeds are there in the hands of the project owner at the time of the preferential payment. Exactly. And isn't that the issue that's here, too? Well, factually, they're entirely different. Because. Factually, they may be different, but the legal issue is the same. As far as the legal issue goes, and I will acknowledge that the legal issue that this Court relied on in the decision that you were involved in authoring in the Reuter matter, it is a similar legal issue. The one thing that I'd mention, though, is that the Court, in determining whether principles of collateral estoppel should apply, looked to whether the party against whom that doctrine is going to be applied had a full and fair opportunity to litigate the matter in the prior proceeding. Are you saying that you did not? I'm saying that the trustee did not. In fact, at the trial court level. What issue would the trustee, what matters would the trustee have raised in the prior decision that it was not allowed to raise or have the opportunity to raise? It would have built a much better and complete record on the issue of whether the surety was undersecured at the time of the transfer on that project. The trustee had the opportunity to put in the evidence. The fact that he didn't put it in doesn't preclude us applying collateral estoppel, does it? Well, I would submit that the trustee didn't have the opportunity. Why not? That earlier proceeding was decided in the context of cross motions for summary judgment. So cross motions for summary judgment, each party has the opportunity to submit affidavits? On the particular issue of 547C1, the statutory burden is on the creditor to come forward and raise that defense. The creditor never raised that defense at the trial court level. The contemporaneous exchange exception based on Figuart. So what was the trustee to do at that point in time? If they were cross motions for summary judgment, then the trustee had the opportunity to put in whatever evidence. The trustee had no reason to come forward with evidence on an issue that the creditor was not raising. It's the creditor's responsibility to come forward with evidence on an issue that the creditor was not raising. So the contemporaneous payment for new value, right? And they discussed Figuart extensively. You're absolutely correct, Your Honor, but why do you say you didn't have an opportunity to raise it? What I'm trying to say is that that issue was raised for the first time on appeal. It was not litigated in front of the bankruptcy court, and therefore the trustee did not come forward with the record that he would have liked to come forward on that issue. Well, this opinion says the bankruptcy court found that Reuter did not meet the requirements of the contemporaneous exchange exception, et cetera. And so the issue is before the bankruptcy court and before the appellate court, right? Well, and that's why the bankruptcy court ruled in favor of the trustee. In fact, the bankruptcy judge looked right at counsel for Reuter and said, are you raising the Figuart defense? And the creditor said no. So at that point, the trustee had no reason to come forward with additional supplemental evidence and build a factual record on an issue that the creditor was not pursuing. I could refer this Court to the opening brief in the earlier Reuter decision where the transcript of that hearing is cited where it shows that the creditor in that earlier proceeding Reuter made the defense. Well, the briefs are available on Westlaw, so I suppose we can look at those if we have to. But I acknowledge. But your position is you did not have a full and fair opportunity to litigate that issue. That's the crux of what I'm saying. All right. Did you raise that argument on appeal? Did you on appeal make the argument that you didn't have an opportunity to address the issue? We made the argument that the issue was waived. We made the argument that it was not an issue that was properly considered before the appellate court because Reuter had waived it at the trial court level. You didn't make the argument that you didn't have an opportunity to put in evidence in the record that you would have put in otherwise. I believe we did. If it was not in the original briefs, I'm certain it was in the original briefs. Okay. One last item. My esteemed opponent has said that we have failed to cite a single case that has held that a creditor who signs one of these unconditional waivers is precluded from pursuing its rights against a surety bond. And we have cited the Halbert's Lumber case, which is a California case. It construes the California statute that is the basis for the Arizona statute. The Arizona statute is modeled after the California statute. And in that case, that California court of appeals case that construed that California statute, it said that that waiver was effective regardless of whether the creditor in that case had been paid and could not proceed against the bond. That was the whole issue in that case, whether the creditor could proceed against the bond. So I don't think this is new law. It's the plain meaning of the statutes. And perhaps That goes to the contemporaneous issue, doesn't it? I believe it does. But I think that the simplest way to dispose of this case and make sure that all similarly situated creditors are treated equally is to look at the intent of the parties with this dishonored check. That's what the bankruptcy appellate panel did. It said it's clear from the record that J.W.J. intended the transfer to be in payment of a dishonored check. It's clear that ENDO intended the transfer to be in payment of a dishonored check. For those reasons alone, I think this Court can affirm the decision of the bankruptcy appellate panel. And I would urge the Court to do that. Thank you. All right. Rebuttal. The trustee concedes that the proper course of action for the unpaid subcontractor to follow is to pursue a bond claim. If my judgment is correct, the trustee would have done so. The trustee's position is inconsistent. The trustee relies on the UCC provision that provides, among other remedies, the right to pursue principles, etc. But the trustee ignores the language of the UCC, as adopted in Arizona and I believe throughout the United States, that says that the person who has a check that's dishonored can also sue on the original obligation. The original obligation was a bonded claim, a surety claim. The position of the trustee in this case would confer a windfall on a surety that in no way relied on a release, and without any consideration being given for the release, and in no way relied on a bond claim. And more importantly, the stated consideration for the release being not honored. To answer Judge Thompson's question, or maybe it was Judge Tashima's question, I believe that the Reuter case did have in its statement of facts that there was a dishonored check, although it does not appear that the Court analyzed the effect of the bond claim. The question in this... Do you agree with opposing counsel's argument that the trustee was not given an adequate opportunity to present evidence regarding the contemporaneous exchange for value issue? Well, Your Honor, the only way I can answer that is by reading the opinion that this Court issued, and I can see nothing in that opinion that would be an issue there, and so they were not warned or did not have knowledge that that was going to be an issue that they should put evidence in regarding. Your Honor, unfortunately, I can't address what happened in the bankruptcy court except what's reflected in this Court's opinion, and this Court's opinion clearly reflects that the posture of that case was identical to the posture of this case. In fact, I think it actually started out as the same adversary proceeding where the trustee sued numerous parties for alleged preferential transfers. In that case, as I think Judge Rawlinson will recall, the trustee relied on the very same affidavit that shows that the various projects were underwater at various points in time or at the end. The very same affidavit in this case shows that at least $1.5 million remained in the owner's possession under the contract a year after the bankruptcy was filed. So we submit that it is the same evidence, and the trustee is bound by this Court's conclusion that you take a snapshot of the project at the time. The Halbert's lumber case has no relation to this case. It's not a bankruptcy case. There wasn't even an unconditional lien release involved in that case. Halbert's involved a conditional lien release where the supplier tried to argue that he was only releasing amounts that he had been paid, rather than that it was a release that was in effect as of the time of the release. I know I didn't say that very well, but he was trying to say there were some items I wasn't paid for, and I didn't intend to release that. All the Court held is if you execute a progress payment and you say in there I've been paid to date, that's enforceable. The issue is in this case whether by executing a release that says I'm releasing my bond claim because I'm being paid $194,000, that can take effect before we get the $194,000 and the check bounces, and we submit that it can't. Thank you. All right. Thank you. Thank both counsel. This case is submitted for decision. All right. Next case for argument is Pennington versus Raines.
judges: Thompson, Tashima, Rawlinson